**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JOHN DOE** | * | <u>**JURY TRIAL DEMANDED**</u> |
| C/O GOODWIN WEBER PLLC | | |
| 267 KENTLANDS BLVD. #250, | * | |
| GAITHERSBURG, MD 20878 | | |
|     Plaintiff | * | |
| | | |
| v. | * | |

**(1) JEFFERSON B. SESSIONS, ATTORNEY GENERAL OF THE UNITED STATES**

SERVE:                              *

    (1) Jefferson B. Sessions, III    *
       950 Pennsylvania Avenue, NW
       Washington, DC 20530-0001    *

    &                               *

    (2) Stephen Schenning       *
    Acting United States Attorney for the District of Maryland
    36 South Charles St.           *
    Baltimore, MD 21201 – 2692

&                                   *

**(2)    DANIEL POWERS**       *
      and

**(3) JOHN DOES #1 AND #2**    *

    Special Agents, Federal Bureau of Investigation

SERVE:                              *

    (1)Jefferson B. Sessions, III    *
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001    *
    &
    (2) Stephen Schenning       *
    Acting United States Attorney for the District of Maryland
    36 South Charles St.           *
    Baltimore, MD 21201 – 2692
    &                             *

(3) Daniel Powers
950 Pennsylvania Avenue, NW                    *
Washington, DC 20530-0001

## **COMPLAINT**

1.   This is a suit brought by Plaintiff against Jefferson B. Sessions, III, Attorney General of

the United States, Daniel Powers, Section Chief, Federal Bureau of Investigation ("FBI"),

and John Does 1 and 2, both of whom are unknown special agents of the FBI.  Plaintiff

alleges discrimination and his Constitutional Civil Rights based upon:

a.        **Disability** in violation of Sections **501 and 504 of the Rehabilitation Act**, 29

U.S.C. §§ 791 *et seq.*;

b.      **Retaliation** for protected activity under the aforementioned statute.

c.      Violation of his **privacy** for disclosing confidential medical information and

diagnosis of Plaintiff to his FBI supervisory chain of command in violation of the

Rehabilitation Act.

d.      Violation of Plaintiff's Constitutional Rights under the Fourth and Fifth

Amendment of the United States Constitution pursuant to *Bivens v Six Unknown Named*

*Agents of the Federal Bureau of Narcotics*, 403 US 388 (1971).

2.      This Court has jurisdiction under the Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.*

3.       Venue is proper in the district court pursuant to 28 U.S.C. §§ 1331, 1391(b),

2201 as well as 42 U.S.C. § 2000e-5(f)(3), which is made applicable to Rehabilitation Act claims

in that Plaintiff resides in this judicial district, and Defendant may be found in this judicial

district.

4.      Plaintiff has exhausted all of his administrative remedies as outlined below:

a.      On or about January 20, 2016 Plaintiff filed a Complaint with the DOJ EEO Office (187-2-1765).

b.      On or about July 25, 2017, the DOJ issued a Final Agency Decision, denying Plaintiff's claims for relief.

c. This Complaint is filed on or before the 90th day after the Final Agency Decision.

## **PARTIES**

5.      Plaintiff is a United States Citizen and a resident of the State of Maryland. Plaintiff is 46 years old and suffers from Asperger's Syndrome, Anxiety, Acute Stress Disorder Panic Disorder, and since the FBI's unlawful discrimination, harassment, and reprisal against him, post-traumatic stress disorder ("PTSD").  Plaintiff was employed by the FBI for approximately 25 years.

6.      Defendant is the Attorney General of the United States, and leads the Department of Justice and the FBI.

7.      At all times relevant hereto, Defendant Daniel Powers was the Section Chief for the Personnel Security Division where Plaintiff worked.  At all times relevant hereto, Defendant John Does 1 and 2 were special agents employed by the FBI.

8.      At all times relevant hereto, Kersha Poindexter was the unit chief for the division where Plaintiff worked.

9.      At all times relevant hereto, Tammy Fay McNemar was Plaintiff's second-line supervisor.

10.      At all times relevant hereto, Sheila Ball was Plaintiff's first-line supervisor.

## FACTS

11.      Plaintiff began working for the FBI in 1990, approximately.

12.      At all times relevant hereto, Plaintiff was employed as a Personnel Security Specialist ("PSS").  In that position, Plaintiff was responsible for processing "visitor access requests" ("VAR's") to ensure that only authorized persons were afforded access to FBI facilities.  In processing VARs, Plaintiff was required to search multiple classified databases, including the classified Scattered Castles system.

13.      At all times relevant hereto, Plaintiff was a reliable, hard-working employee.  His performance evaluations were excellent in 2012, 2013 and 2014.

## HOSTILE WORK ENVIRONMENT CLAIMS

14.      In April or May 2015, Unit Chief Poindexter held a meeting and stated that Plaintiff "was about to be debriefed"; that he should "turn in his badge"; and that he would be "escorted from the building."   Poindexter then laughed and said she was only joking.  However, Plaintiff felt very anxious and uncomfortable as a result of these remarks.

15.      That following the incident, Plaintiff suffered flash backs.  He suffered great anxiety and emotional concern over the incident. The next day Ball apologized for the inappropriate comment by Poindexter. A week later, Plaintiff told Ball that he was still reeling and very upset from the meeting.

16.      In the summer of 2015, the personnel security division held a team building meeting and the participants did a role-playing exercise. Plaintiff played the part of an employee on the telephone with a customer.  Plaintiff became flustered during the exercise and he was unable to find his lines.  Poindexter made disparaging remarks to Plaintiff to the effect that he was unworthy to volunteer.

17.     Plaintiff became anxious, humiliated and embarrassed as a result of this episode. Plaintiff felt humiliated, embarrassed, and totally publicly degraded in front of his co-workers. Plaintiff suffered great anxiety and emotional concern over the incident.

18.     In July 2015, Plaintiff approved a VAR for an individual who was seeking admission to the FBI.  Unbeknownst to Plaintiff, one of Plaintiff's co-workers had previously denied the same VAR.   Following this episode, on July 16 ,2015, a meeting was held with Plaintiff, Poindexter, McNemar, Ball and a co-worker (who had denied the VAR).  Poindexter acted in an inappropriate manner (using an offensive tone and gestures).  Plaintiff explained that, unlike his co-worker, he had not been trained in the use of the database that the other employee had used.  Poindexter falsely accused Plaintiff of being negligent in his work duties and of not following proper procedures.

19.     Following the July counseling session, Plaintiff told Ball that nobody had ever spoken to him like Poindexter had done.  Ball acknowledged that the manner that Poindexter treated Plaintiff was inappropriate.

20.     Plaintiff began to experience panic attacks, and he took sick leave for several weeks.  Plaintiff then returned to work on August 3, 2015.  At that time, his supervisors hounded Plaintiff to provide notes explaining why he was out of work and why his work was not being done (even though he was out sick and his supervisors were clearly aware of this). The supervisors accused Plaintiff of not getting his work done (even though he had been out on sick leave).

21.     The FBI (by and through its agents, servants and/or employees) treated Plaintiff differently, unfairly, and singled him out because of the time he took off (which was all due to

5

being continuously harassed at work).  Plaintiff never witnessed other co-workers being treated this way for taking leave off.

22.     That on or about August 10, 2015, Plaintiff began to assign data-entry work to a subordinate employee.

23.     On August 17, 2015, management provided a memorandum to Plaintiff, chastising him for delegating his work to a subordinate co-worker.  During this same August 17, 2015 meeting, Plaintiff had a panic attack.

24.     On August 24, 2015, Plaintiff met with the FBI Ombudsman.  He voiced his complaints and concerns that he was being treated differently from other coworkers. For example, Ball had threatened Plaintiff with being AWOL even though he had available sick leave.  Also, Plaintiff discovered that all of his clearances had been revoked, and he could not check his electronic timecard to learn how much sick leave remained. The Ombudsman was surprised that Plaintiff could not get into his electronic timecard.

25.     That following this period of harassment, Plaintiff remained out of work pursuant to the Family Medical Leave Act (FMLA) leave from mid-August 2015 until November 4, 2015.[1]

26.     On November 4, 2015, Plaintiff returned to work after exhausting his FMLA leave.  Upon his return, the FBI supervisors did not afford Plaintiff the opportunity to review his emails, nor did the FBI permit Plaintiff to learn of the new processes and procedures or required training (with deadlines quickly coming up) that had come in during his absence.  Based on Plaintiff's more than 20 years of FBI experience, he knew he needed to weed out, and then read

---

[1] FMLA would allow Plaintiff to be out of leave for a medical reason without pay, but if sick leave was available for him in his timecard balance, paid leave is available rather than leave without pay.

the most important emails. As he suspected, there were new processes and procedures to follow, as well as mandatory training to complete (the deadline was quickly approaching) and that if he wanted any input in his performance review, he had approximately a day to write something up.

27.     Notwithstanding the foregoing, Ball told Plaintiff that it was not necessary for him to read any of his emails.  It instead appeared to Plaintiff that FBI management was on a path to remove him from his position.

28.     The FBI discriminated against Plaintiff because he was "different" (i.e. because of his Asperger's).  Also, the FBI harassed and reprised against Plaintiff because of his  disability, and his invocation of a request for reasonable accommodation due to the disability.  Also, the FBI harassed and reprised against Plaintiff based on the perception of a disability, once the FBI supervisory chain of command became specifically aware of his diagnosis of Asperger's Syndrome, even though he had functioned and performed without issue at the FBI for approximately 25 years.

29.     On November 4, 2015 at 7:20 a.m. (only a few minutes after Plaintiff technically started work), Ball informed Plaintiff to come to her cubicle (with Tammy McNemar), and in a loud voice, proceeded to discuss personally sensitive matters in a very public setting, where co-workers could hear the details.

30.     Shortly thereafter, on November 4, 2015 at 9:30 a.m., Section Chief Powers held a meeting during which he did the following:

   a.   <u>Demanded that Plaintiff justify his salary and position with the federal government, as he otherwise would no longer be working at the FBI</u>.

   b.   Demanded that Plaintiff write a request by e-mail "in his own words" within one (1) hour explaining his diagnosis, prognosis, and the accommodations he needed (<u>even though this</u>

<u>information had all previously been provided</u> to the FBI EEOC Accommodations department in the form of written doctors notes; and despite the fact that this information was highly confidential protected medical information).

c. Demanded that Plaintiff provide a doctor's letter within one (1) day that justified using November 3, 2015 as FMLA.  (Note: on November 3, 2015, Plaintiff saw his treating physician, Dr. Hayden, in order to gather the additional information requested by the FBI Reasonable Accommodations Committee). Plaintiff explained to Powers that the doctor would provide a doctor's note, and that it would be ready on Thursday.

d. The November 4, 2015 meeting took place in a conference room. During the meeting, Plaintiff discovered that his supervisor, Ball, <u>changed his primary duties to full-time data entry work</u>.  Prior to his exercise of FLMA leave, Plaintiff was employed as a personnel security specialist ("PSS") and only occasionally did the data entry that was part of his assigned review of VARs.  His primary duties, as stated in his last Performance Appraisal, did not include full-time data entry. The bulk of his duties involved working on VAR's, and providing the analysis necessary to complete VARs.  The downgrade in responsibility and change of duties to working full-time on unassigned VAR data entry, was an extreme change in Plaintiff's regular duties. Neither manager showed any care for Plaintiff's health concerns, but instead insisted that full-time data entry would be the work to which he would now be assigned.

31. On November 5, 2015, *another* meeting took place with Plaintiff.  At this meeting,  Powers told Plaintiff that he had committed two (2) acts of direct insubordination because he had not typed up the demanded report (from the November 4th meeting) within the one hours' time ordered, as set forth above, and because he did not obtain the requested

doctor's report within one day, as ordered.  Plaintiff explained that he *had* turned it in, but that it took longer than an hour. Plaintiff asked both Ball and Poindexter (supervisors) if either of them had read the report he had provided the day before. Both denied having read it. The FBI, through Section Chief Powers, was piling on, and was simply trying to force the end of Plaintiff's 25 year FBI career.

32.     In reality, Plaintiff *did* provide a doctor's report to the FBI as requested, although the request that he provide this report within one (1) day was not feasible; i.e. the doctor's report was sent into the FBI Reasonable Accommodations Committee and the doctor's note for the day off was provided to FBI management.   Plaintiff typed up a report and provided it to his supervisors, but they never actually read it.

33.     At the November 5, 2015 meeting, the supervisors threatened Plaintiff with termination from the FBI and federal service and stated that Plaintiff should turn in his badge if he left the meeting prior to agreeing to all of their demands.    Powers berated Plaintiff, saying that he needed to justify his salary.  In conference room with glass walls, a fish bowl setting where the entire unit could observe the meeting, Chief Daniel Powers demanded that Plaintiff do all the data entry work.  Powers made it clear he would not accept any excuses that the data entry would push Plaintiff into another panic attack.

34.     During this meeting, Plaintiff saw a Letter of Reprimand from August 3, 2015 (his last day worked before the FMLA leave).   This Letter of Reprimand ("LOR") was false and discriminatory.  Daniel Powers, Sheila Ball, Tammy Poindexter, and Kristine Pfieffer were trying to intimidate and humiliate him in public, and were using this false LOR as a

pretext; i.e., an attempt to get him to enter a panic attack, knowing full well what that would mean.

35.     The meetings on November 4 and November 5, 2015 occurred in a glass-walled conference room, within public view of all of Plaintiff's coworkers.  Some of Plaintiff's co-workers observed this ongoing campaign of harassment and were mortified at how he was being treated, and discovery and trial testimony will demonstrate how outrageous this treatment was. The supervisors continued to ignore (as they had in the previous meeting that day, and the day before) Plaintiff's explanation that performing data entry caused an exacerbation of his diagnosed anxiety and medical conditions.

36.     During the November 5, 2015 meeting, Plaintiff then began to have a panic attack.  He repeatedly requested access to, and the use of his personal cell phone during a panic attack (the cell phone has a calming app that Plaintiff uses, and was prescribed by his treating physician).[2]   The supervisors failed to obtain the cell phone for Plaintiff even though he requested it over and over. Plaintiff advised the supervisors more than once that he was undergoing a panic attack and that he needed his cell phone.    In addition, Plaintiff attempted to retrieve his own cellphone; he was not permitted to do so, and was held in the conference room, as described below, by two armed special agents of the FBI.  Preventing him from obtaining his own cell phone (for the calming app) and movement by his own free will was a violation of Plaintiff's Fourth and Fifth Amendment rights.  In essence, he was deprived of his property, and

---

[2] Because the Security Division works within a Secure Classified Information Facility ("SCIF"), FBI employees are not allowed to bring their personal electronic devises into the office.  These devises are instead placed into lockers.  Therefore, Plaintiff did not have his personal cell phone, with his physician prescribed calming app, when the panic attack began during the meeting in the conference room.

underwent an unreasonable seizure, without warrant, that restrained his liberty, without due process of law.

37.     At the November 5, 2015 meeting, an additional unit chief was present.  She had been Plaintiff's Employment Assistance Program representative in the past, but in this case she was there as a unit chief (which was a breach of confidentiality and, a violation of the Rehabilitation Act).

38.     Two (2) armed special agents were called into the November 5, 2015 meeting. Special agents are not normally assigned to the FBI Personnel Security Division, which meant that the FBI management had planned in advance to have two (2) armed special agents on standby to come into the meeting. The purpose of the two armed special agents was plainly to intimidate and exacerbate Plaintiff's anxiety and to provoke him into a panic attack. Plaintiff, after approximately 25 years in the FBI understood the plain implications of the agents – they were there for *him* – and were not there for any benign assistance.   Indeed, when Plaintiff attempted to obtain his cell phone and calming app, he was not permitted to leave the conference room, and his co-workers were prevented from bringing it to him, in violation of the Fourth and Fifth Amendments.

39.     The November 5, 2015 meeting, resulted in Plaintiff being in considerable emotional distress.  This culminated in Plaintiff's supervisors calling for paramedics from the District of Columbia Fire Department.  Along with two armed special agents, Plaintiff was then transported to the George Washington University Hospital Emergency Room. When Plaintiff arrived, he was then met by two additional armed District of Columbia Metropolitan Police Department Police Officers. These officers were not randomly or accidently at the

hospital; they were summoned there.  The emergency room doctor repeatedly stated to both Plaintiff and Plaintiff's wife that having two (2) armed police officers waiting for a man in the ER who is having a panic attack, was highly unusual and irregular and the doctor actually noted this irregularity in the medical records of Plaintiff's visit, which will be entered at evidence in this matter.  The presence of the police at the hospital, immediately after the presence of armed special agents at the FBI, was a demonstration, once again, that FBI management was treating Plaintiff differently, in a discriminatory manner and/or reprising against him due to his disability or for having requested reasonable accommodation and/or for having invoked the Family Medical Leave Act.

40.     On November 5, 2015, Plaintiff was seen at GWU Hospital for an acute panic attack that took several hours to alleviate. The ER doctor instructed Plaintiff to follow up the next day with his psychiatrist.

41.     Since the November 5, 2015, incidents at both the FBI and GWU Hospital, Plaintiff has been diagnosed with new emotional issues (including an acute stress reaction) as a direct result of the harassment and by the manner that he was treated by the FBI.  He has been forced to remain out of work and remain under the care of a psychiatrist, undergoing treatment, and taking medication.

## REASONABLE ACCOMMODATION CLAIMS

42.     On August 14, 2015, Plaintiff applied for leave under the Family Medical Leave Act ("FMLA")

43.     On or about August 20, 2015, Plaintiff began to experience frequent panic attacks.

44.     On or about August 26, 2015, Plaintiff spoke to the FBI's Reasonable Accommodation Program Coordinator (RAPC), Rodney Yelder, and initiated the process for a reasonable accommodation under the Rehabilitation Act.  Plaintiff provided medical and other documentation in support of this request.

45.     On or about August 27, 2015, Yelder distributed confidential medical documentation to Plaintiff's supervisors.  That information included Plaintiff's long-standing diagnosis of Asperger's Syndrome.

46.     Yelder's communication of Plaintiff's medical diagnosis was not necessary for Plaintiff to seek a reasonable accommodation, and was a *per se* violation of both the Rehabilitation Act and the Privacy Act.  After Plaintiff's management became aware of Plaintiff's diagnosis, or perceived diagnosis, the treatment of Plaintiff within the FBI significantly worsened.  On information and belief, the FBI did not want to have a "mentally disabled" employee within the Personnel Security Section.

47.     On September 4, 2015, Plaintiff submitted a voluntary leave bank form transfer program (VLTP) form to his supervisor Ball. The reason for this request was because Plaintiff had used up all his sick leave (having been out of work since mid-August, 2015).  Ball advised that she would submit the leave request that same day.  However, she delayed in submitting the request until September 22, 2015.   On September 26, 2015, the leave was approved, but nobody from management immediately notified Plaintiff.  Rather, Plaintiff's wife pushed for an answer and finally learned that the leave had been approved in early October 2015.

48.     On or about October 22, 2015, the FBI's OEEOA Reasonable Accommodation Committee (RAAC) advised Plaintiff that they required additional medical documentation to evaluate his request.  The RAAC acknowledged that Plaintiff had a disability.

49.     On or about October 22, 2015, Plaintiff's treating doctor, Dr. Hayden submitted a letter requesting the following accommodations for him:

1. Allow telework 2 to 3 days per week.

2.  Provide flexible leave for health problems.

3. Provide self-paced work load and flexible hours.

4. Allow for breaks for use of stress management techniques.

5. Maintain open channels of communication.

6. Provide clearly detailed pictures of work assignments in writing.

7. Develop written work agreements and document changes in non-judgmental terms.

8. Develop strategies to deal with problems before they arise.

9. Provide weekly or monthly meetings to discuss production level and workplace issues.

10. Provide praise and positive reinforcement.

11. Avoid public reprimands.

50.      On or about October 23, 2015, the (new) RAAC coordinator, Sara Leung, acknowledged receipt of Plaintiff's medical documentation and indicated that the accommodation process would commence.

51.     On or about October 31, 2015 the RAAC convened again, and submitted the same questions back to Plaintiff (and his treating physician).

52.     The FBI failed to grant Plaintiff's requested accommodations on or about October 31, 2015.

53.     On November 4, 2015, Plaintiff's treating physician provided the FBI with another letter itemizing the requested accommodations.

54.     On November 4, 2015, Plaintiff was summoned to a meeting with Section Chief Powers, Poindexter, Ball and McNemar.  Powers demanded that Plaintiff provide a written justification for his salary and position.  In addition, Powers instructed Plaintiff that he had an hour to provide a written document explaining his diagnosis, prognosis and required accommodations.

55.     Prior to the November 4, 2015 request, Plaintiff had already provided medical documentation which the Human Resources Department had deemed sufficient.

56.     Powers also told Plaintiff that he had one day to provide a doctor's note explaining his absence on November 3, 2015.  However, a note was not necessary because Plaintiff had already provided a note to explain his absence from work.

57.     The manner that this meeting was held was in direct contravention of the treating doctor's recommendations; i.e. Plaintiff was publicly reprimanded and he was treated in a harsh and judgmental manner.

58.     The FBI specifically acted in a manner contrary to the treating doctor's recommendations, and Plaintiff's supervisors intentionally acted in a manner contrary to Dr. Hayden's accommodation requests in order to cause Plaintiff further emotional distress, and to provoke further panic attacks. In addition, the FBI's designated point-of-contact as well as the Reasonable Accommodations Committee delayed acting on the requested accommodations.

59.     On November 4 & 5, 2015, Plaintiff's supervisors retaliated against him in direct reprisal for going to the RAC and/or for filing an EEO Complaint

60.     Plaintiff began to shake and he had to leave the meeting.  Immediately following the November 4, 2015 meeting, Plaintiff spoke to his wife (via telephone) who provided a written response and emailed it to Ball.

61.     On November 5, 2015, Plaintiff's treating doctor asked the FBI to provide her with Plaintiff's job duties.  The FBI expressly refused to provide this information to Dr. Hayden.

62.     On November 5, 2015, Ball told Plaintiff that he would be assigned full time duties of data entry work.  This new assignment was not consistent with his job duties or his grade level.

63.     On November 5, 2015, Plaintiff was summoned to a meeting with Powers, Ball, McNamara and Poindexter, as well as another Unit Chief.  This meeting occurred in a central conference room ("fish bowl") atmosphere that was visible to other employees.   Two (2) armed FBI agents also attended the meeting. The supervisors bullied Plaintiff during this meeting. They told him he should turn in his badge if he was to leave the meeting without acceding to their demands.  The supervisors then provided Plaintiff a Letter of Reprimand.

64.     At the November 5, 2015 meeting, management accused Plaintiff of being insubordinate for not sending an email the day before.  However, Sheila Ball has acknowledged receiving the requested email on November 4 at 1:00 pm.

65.     Plaintiff began to suffer a panic attack as a result of the bullying during the meeting. Plaintiff asked for his cell phone (which contained an app that help calm his attacks) but management was unable or unwilling to provide the phone.

66.     Plaintiff was taken by ambulance to a local hospital as a result of the panic attack. Plaintiff was greeted by two (2) Metropolitan Police Officers at the emergency room.      .

67.     On November 10, 2015, Dr. Hayden again provided a list of requested accommodations to the FBI.

68.     The FBI never granted the request for reasonable accommodation.

69.     In November 2015, the FBI informed Plaintiff that he was being charged AWOL (Absent Without Leave).

70.     Plaintiff was never able to return to work after the November 5, 2015 meeting due to the damage that the FBI had caused to Plaintiff.

## DISABILITY DISCRIMINATION AND REPRISAL

71.     Plaintiff remained out of work from mid-August to November 4, 2015.   Ball called Plaintiff while he was home sick, advising that he would be charged AWOL if he did not return to work (even though he had sick leave available).

72.     Plaintiff's managers and supervisors were fully aware of his exercise of FMLA leave as he was out of work from August 18, 2015 to November 4, 2015.

73.     As of August 2015, RAMP Yelder notified Plaintiff's manages that he had a disability (Asperger's Syndrome, anxiety, and panic attacks).

74.     On or about October, 23, 2015, Plaintiff initiated contact with his EEO Counselor.

75.     Plaintiff returned to work on November 4, 2015.

76.     On or about November 3, 2015, Plaintiff returned to work.   At that time he had hundreds of emails to read.  Although Plaintiff thought it wise to read these emails so that he could bring himself up to speed, Ball instructed Plaintiff not to read the emails saying that this was not part of his job duties.  The FBI did not provide Plaintiff with any training or an opportunity to re-acclimate to the workplace.

77.     In reprisal for his disability (which resulted in the use of FMLA leave as Plaintiff was absent from mid-August 2015 to November 4, 2015), Ball assigned Plaintiff data entry tasks that were not part of his regular job duties (Plaintiff is a GS-12, whereas data entry work is a GS-5 level duty).

78.     On or about November 30, 2015, Poindexter contacted Plaintiff's treating physician, Dr. Hayden.

79.     On or about November 20, 2015, Plaintiff's managers received written information referencing his EEO Complaint.

80.     On or about November 30, 2015, Plaintiff requested additional leave to address his medical concerns.

81.     On or about February 8, 2016, Poindexter proposed that Plaintiff be removed from his position.

82.     On or about March 7, 2016, Section Chief Wendy Guthrie wrote a letter to Plaintiff, proposing that he be removed.

83.     On November 4, 2016, the FBI terminated Plaintiff

## COUNT I

### Denial of Reasonable Accommodation

84.     All facts and allegations contained hereinabove are incorporated by reference without being fully repeated herein.

85.     Plaintiff is a qualified person with a disability insofar as Plaintiff had the requisite skill, experience, education and job-related requirements of a Personnel Security Specialist. Plaintiff had worked for the FBI for 25 years and had the requisite training, clearances and ability to do the job. In addition, Plaintiff's performance evaluations had always been satisfactory (at a minimum).

86.     Plaintiff made written requests for accommodation between August and November 2015, and provided doctor's notes in support of his request.

87.     On or about October 21, 2015, the FBI denied Plaintiff's request for a reasonable accommodation.

88.     In meetings on November 4 and 5, 2015, the FBI treated Plaintiff in a harsh manner (entirely contrary to the treating doctor's recommendations).

89.     That as a direct result of the foregoing, Plaintiff has suffered irreparable loss and injury including, but not limited to, economic loss, humiliation, embarrassment, emotional distress, physical harm and deprivation of his right to employment opportunities.  In addition, the Defendant's discriminatory and retaliatory treatment of Plaintiff resulted in loss of pay, retirement benefits, job training, job progression and financial injury.

90.     The strain caused by the embarrassment, humiliation and indignity of denying the reasonable accommodations requests caused emotional and mental suffering, including anxiety, depression and panic attacks.

## COUNT II

### Hostile Work Environment

91.     All facts and allegations contained hereinabove are incorporated by reference without being full repeated herein.

93.     The FBI subjected Plaintiff to a hostile work environment which was both severe and pervasive.

94.     The hostile work environment was based on Plaintiff's disability.

95.     In addition, the hostile work environment was done in reprisal for his protected activity (to include his exercise of FMLA leave, his filing of EEO complaints; and his requests for reasonable accommodation).

96.     The hostile work environment included:

a.     In April or May 2015, telling Plaintiff that he was about to be debriefed and that he should turn in his badge.

b.     In the summer of 2015, telling Plaintiff he was "unworthy to volunteer" during the course of a team-building exercise.

c.     In July 2015, falsely accusing Plaintiff of being negligent in his work.

d.     In July 2015, falsely accusing Plaintiff of not getting his work done.

e.     On August 3, 2015, falsely accusing Plaintiff of not getting his work done despite having been out sick.

f.     On or about November 4, 2015, not permitting Plaintiff to review his emails and otherwise become reaccelerated to the workplace.

g.     On November 4, 2015, telling Plaintiff that he had to justify his salary and directing him to provide a doctor's note to justify his use of leave.

h.     On November 4, 2015, changing Plaintiff's duties to require him to perform data-entry tasks.

i.     On November 5, 2015, changing Plaintiff's duties to data entry.

j.     On November 5, 2015, ridiculing Plaintiff in a public meeting with armed guards present, and then not permitting him the use of his cell phone.

k.     On November 5, 2015, sending police offices to the emergency room where Plaintiff was being treated for panic attacks.

l.     In November 2015, charging Plaintiff with AWOL.

97.     The hostile work environment was severe and pervasive.  It affected the terms, conditions and privileges of his employment.  Among other things, Plaintiff had to seek medical

care as a result of his treatment.  In addition, he was so damaged by this treatment that he was unable to return to work, leading to his termination.

98.     That as a direct result of the foregoing, Plaintiff has suffered irreparable loss and injury including, but not limited to, economic loss, humiliation, embarrassment, emotional distress, physical harm and deprivation of his right to employment opportunities.  In addition, the Defendant's discriminatory and retaliatory treatment of Plaintiff resulted in loss of pay, retirement benefits, job training, job progression and financial injury.

99.     The strain caused by the embarrassment, humiliation and indignity of being subjected to a hostile work environment caused emotional and mental suffering, including anxiety, depression and panic attacks.

## COUNT III
## Termination

100.    All facts and allegations contained hereinabove are incorporated by reference without being fully repeated herein.

101.    On November 4 and November 5, 2015, Plaintiff's supervisors retaliated against him in direct reprisal for using FMLA, going to the RAC and/or for filing an EEO Complaint. As a result of the events of November 4 & 5, 2015, Plaintiff's treating psychiatrist advised the Agency that Plaintiff cannot return to work.   The retaliation and hostile work environment were so severe that Plaintiff was forced to remain under the constant care of a psychiatrist and was repeatedly hospitalized. Plaintiff was forced to remain out of work after November 5, 2015. Indeed, he has never able to return to his job.

102.    That on or about November 4, 2016, Plaintiff was terminated from his position with the FBI.

103.    That the termination was based on Plaintiff's disability.

103.    That in the alternative, the termination was in reprisal for protected activity.

104.    That Plaintiff lost his 25-year career, including loss of salary, loss of health insurance, retirement contributions and future retirement pension under the federal employees retirement system.

105.    That as a direct result of the foregoing, Plaintiff has suffered irreparable loss and injury including, but not limited to, economic loss, humiliation, embarrassment, emotional distress, physical harm and deprivation of his right to employment opportunities.  In addition, the Defendant's discriminatory and retaliatory treatment of Plaintiff resulted in loss of pay, retirement benefits, job training, job progression and financial injury.

106.    The strain caused by the embarrassment, humiliation and indignity of being denied a promotion and job progressions  caused emotional and mental suffering, including anxiety, depression and panic attacks.


## COUNT IV

### Breach of Confidentiality - Disclosure of Medical Information

107.    All facts and allegations contained hereinabove are incorporated by reference without being fully repeated herein.


108.    The Rehabilitation Act requires federal managers to place employee medical information on separate forms and in separate medical files; to treat those files as "confidential medical records"; and to keep all employee medical information confidential.

109.    An employee's medical information may not be disclosed unless permitted by a particular exception in the Rehabilitation Act.

110.    In August 2015, the Reasonable Accommodations counselor, Yelder, obtained Plaintiff's medical records as well as information on his Asperger's Syndrome diagnosis.  Yelder was obligated to collect and maintain the Plaintiff's medical information separate and to treat it as confidential.

111.    That in breach of the FBI's statutory duties, on or about August 27, 2015, Yelder distributed confidential medical documentation to Plaintiff's supervisors.  That information included Plaintiff's long-standing diagnosis of Asperger's Syndrome. This was the first time, in approximately 25 years, that the FBI had actual knowledge that Plaintiff not only appeared to be differently abled, but that he held a diagnosis of Asperger's Syndrome.

112.    Said disclosure was not was not necessary for Plaintiff to seek a reasonable accommodation, nor was it necessary that the supervisors have this information, nor does the disclosure meet any exception under 29 CFR 1630.14(b)1, (c)1 or (d)1.   This disclosure was a *per se* violation of both the Rehabilitation Act and the Privacy Act.[3]

113.    After Plaintiff's management became aware of Plaintiff's diagnosis, or perceived diagnosis, the actual treatment of Plaintiff within the FBI significantly worsened.  On information and belief, the FBI did not want to have a "mentally disabled" employee within the Personnel Security Section, or the FBI generally.

114.    That as a direct result of the foregoing, Plaintiff has suffered irreparable loss and

---

[3]   Plaintiff will clarify that the instant Complaint seeks relief only under the Rehabilitation Act even though the Defendant also violated the Privacy Act.  5 USC §552a.

injury including, but not limited to, economic loss, humiliation, embarrassment, emotional

distress, physical harm and deprivation of his right to employment opportunities.  In addition, the

Defendant's discriminatory and retaliatory treatment of Plaintiff resulted in loss of pay,

retirement benefits, job training, job progression and financial injury.

115.    The strain caused by the embarrassment, humiliation and indignity of denying the

reasonable accommodations requests caused emotional and mental suffering, including anxiety,

depression and panic attacks.

## COUNT V

### Bivens Action Against Powers and Two Unknown Agents of the FBI

116.    All facts and allegations contained hereinabove are incorporated by reference

without being fully repeated herein.

117.    This count is brought pursuant to *Bivens v. Six Unknown Agents for the Federal

Bureau of Narcotics* against Co-Defendant Daniel Powers and Defendants John Doe 1 and 2,

seeking damages for violating Plaintiff's Civil Rights.

118.    The Fourth Amendment protects citizens from, *inter alia,* unlawful searches or

seizures.  The Fifth Amendment protects citizens from, *inter alia*, unlawful deprivations of life,

liberty and property.

119.    At all times relevant hereto, the United States Department of Justice was the

employer of Co-Defendants Powers and John Does 1 and 2, special agents of the FBI.

120.    The actions of Powers and Does were done within the scope of their employment

as an agents, servants and/or employees of the Department of Justice, and occurred under color

of federal law.

121.     Each of Defendants Powers, Doe 1 and Doe 2 is sued in their official capacities and were acting within the scope of their official duties.

122.     That Powers and Does 1 and 2 deprived Plaintiff of his Constitutional rights under the Fourth Amendment and Fifth Amendment on the afternoon of November 5, 2015, to wit:

a.     During the meeting on November 5, 2015, Plaintiff sunk into a full blown panic attack and requested that he be able to obtain his cell phone to use the calming app on the phone, prescribed by his treating psychiatrist.  Powers and Does 1 and 2 did not permit Plaintiff to obtain his personal cell phone.

b.      Powers instead instructed two (2) armed special agents to remain in the conference room to intimidate Plaintiff and to prevent him from leaving the room of his own free will.  The agents and Powers also prevented third parties, including horrified co-workers of Plaintiff to render him aid, or bring him his cell phone.  This only served to trigger Plaintiff's anxiety and provoked a panic attack.

c.     Plaintiff only left the November 5, 2015 meeting on a stretcher, restrained,  and he was transported to the GW University Hospital Emergency Room.  Powers, Does 1 or 2, or other FBI personnel summoned District of Columbia Metropolitan Police Officers to the GW University Hospital, who were also armed, to further harass and intimidate him.

d.     At no time did Plaintiff constitute a physical safety hazard or risk either to himself, personnel of the FBI, or a member of the public such that it was permissible to restrain his freedom of movement, or restrict his ability to obtain the calming app on his cell phone.

123.     Co-Defendants Powers, Does 1 or 2 deprived Plaintiff of his constitutional rights by detaining him without probable cause, and without warrant.  In addition, Powers and Does 1 or 2 used the presence of armed special agents of the FBI, and the implied use of force that could

be brought to bear against Plaintiff, to detain Plaintiff (or any reasonable person in a similar situation with 25 years of FBI experience), maliciously failing to afford Plaintiff the opportunity to obtain his cell phone calming app.

124. At no time did Plaintiff cause or contribute to his panic attack.

125. At no time was Plaintiff charged with any crime or wrongdoing in connection with the events of November 5, 2015, and at no time related to the events of November 5, 2015 was Plaintiff committed, voluntarily or involuntarily, for any medical, psychological, or safety reason from the visit of November 5, 2015, although the FBI through its employees or agents, or the Metropolitan Police Department, did in fact seize Plaintiff, and deprived him of both his liberty and his property (the cell phone calming app).

126. As a direct and proximate result of the foregoing, Plaintiff has suffered irreparable loss and injury including, but not limited to, economic loss, humiliation, embarrassment, emotional distress, physical harm and deprivation of his right to employment opportunities.  In addition, the Defendant's discriminatory and retaliatory treatment of Plaintiff resulted in loss of pay, retirement benefits, job training, job progression and financial injury.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor and award him the following relief:

A. Declare that the actions of Defendant constitute discrimination, harassment and retaliation in violation of the Rehabilitation Act;

B. Award Plaintiff economic and non-economic damages in an amount to be determined at trial,  for his loss and injury including, but not limited to, economic loss, embarrassment, humiliation, emotional pain and suffering, physical injuries,

inconvenience, and other non-pecuniary loses and deprivation of his right to equal employment opportunities, in an amount to be determined,  but in no event less than $300,000.00 and/or the maximum permitted by law for each violation;

C.   Award Plaintiff all lost salary and benefits that he would have received had Defendant not engaged in unlawful discrimination and retaliation, including appropriate back pay, benefits and front pay;

D.   Order the Defendant to give a positive recommendation when contacted by prospective employers of Plaintiff;

E.   Award Plaintiff prejudgment interest;

F.   Award Plaintiff  reasonable attorney's fees and costs incurred in this action and the administrative claim that preceded it;

G.   Punitive damages if so available to deter the FBI from future misconduct; and

H.   Award such other relief as the Court deems appropriate and just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, Plaintiff requests a trial by jury as to all issues in this case.

_____/s/_____*Richard J. Link*_____

RICHARD J. LINK, #24465
DAVID P. WEBER, #07225
Counsel for Plaintiff
GOODWIN WEBER PLLC
267 Kentlands Blvd., Suite 250
Gaithersburg, MD 20878
(301) 850-7600 voice
(301) 850-3374 fax