## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JOHN DOE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-4 (RC) |
| | : | | |
| v. | : | Re Document No.: | 45 |
| | : | | |
| MERRICK B. GARLAND,[1] | : | | |
| Attorney General of the United States | : | | |
| | : | | |
| Defendant. | : | | |

### MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Pseudonymous Plaintiff John Doe, a longtime employee of the Federal Bureau of Investigation, brings this suit under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, for unlawful denial of reasonable accommodations, discriminatory and retaliatory hostile work environment, and discriminatory and retaliatory termination due to the FBI's alleged actions based on Plaintiff's disabilities and protected activity. Defendant the Attorney General of the United States moves to dismiss and for summary judgment on all remaining counts. For the reasons given below, Defendant's motion is granted.

---

[1] United States Attorney General Merrick B. Garland is automatically substituted for Monty Wilkinson pursuant to Federal Rule of Civil Procedure 25(d). *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

## II.  FACTUAL BACKGROUND[2]

Plaintiff worked at the Federal Bureau of Investigation as a Personnel Security Specialist during all relevant times.  Def.'s Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2, ECF No. 45.  His job was to process "visitor access requests" for individuals who needed to visit FBI facilities to ensure that only authorized visitors were permitted.  SUMF ¶ 3.  This job "required inputting information on a spreadsheet and then searching a few different databases."  *Id.*; *see also* SUMF ¶ 26.  Defendant does not dispute that Plaintiff "was diagnosed with Asperger's syndrome, anxiety, acute stress disorder, and eventually in November 2015, post-traumatic stress disorder."  SUMF ¶ 9.  Plaintiff claims that he was diagnosed with Asperger's Syndrome no later than 2011.  Mem. Supp. Pl.'s Opp'n Def.'s Mot. Dismiss & Mot. for Summ. J. ("Opp'n") at 11.

During a meeting in April or May 2015, one of Plaintiff's supervisors stated that Plaintiff would be terminated, but then stated that it was a joke and thanked Plaintiff for his work on an assignment.[3]  SUMF ¶ 10.  Plaintiff claims that he was "mortified," but acknowledges that after he was told it was a joke, he at least appeared "at ease."  Opp'n at 11–12.

During a role-playing exercise in the summer of 2015, Plaintiff volunteered to participate and was unable to respond to an inquiry during the exercise because he "became confused."  SUMF ¶ 13; Opp'n at 12.  Plaintiff contends that, in response, a supervisor remarked that

---

[2] This section recounts the relevant facts in the light most favorable to Plaintiff.  Citations to Defendant's Statement of Undisputed Material Facts ("SUMF") are to those facts that are undisputed by Plaintiff unless otherwise noted.

[3] Plaintiff had four supervisors of different seniority levels.  *See* SUMF ¶¶ 4, 6–8.  But it is not necessary for this opinion's purposes to delineate which supervisor took which actions, so this opinion will refer to Plaintiff's supervisors generically to simplify the background and analysis.  From the Court's review of the undisputed and disputed facts, there is no combination of knowledge or actions among supervisors that would alter the Court's analysis or conclusions.

Plaintiff "was unworthy to volunteer."  SUMF ¶ 14.  Afterward, Plaintiff "felt humiliated," although the supervisor "told him it was okay."  Opp'n at 12.

A meeting was held in July 2015 in response to Plaintiff mistakenly concluding that a proposed visitor should be granted access to FBI facilities.  SUMF ¶¶ 16–21.  In the meeting, Plaintiff stated that he was not trained to use the database that would have resulted in the correct determination; he also claims that a supervisor stated that Plaintiff was negligent.  SUMF ¶¶ 22–23.  Plaintiff interpreted his supervisor's reprimand as "belittling" and "humiliating."  Opp'n at 12.  Another supervisor in the meeting "said that she was offended by the tone and the gestures exhibited in the meeting."  *Id.*  After this meeting, Plaintiff took several weeks of sick leave and returned to work on August 3, 2015.  SUMF ¶ 25.  During his leave, Plaintiff began seeing a physician, specifically a psychiatrist, and "was diagnosed with anxiety and panic attacks."  Opp'n at 13.

Upon his return in August 2015, Plaintiff felt that he was harassed for his lack of productivity.  Opp'n at 13.  He delegated "his data entry duties" to a contractor to improve his productivity.  SUMF ¶¶ 27–28, 30.  One of Plaintiff's supervisors believed that Plaintiff did not have the authority to delegate work and therefore asked Plaintiff for an explanation.  SUMF ¶ 29.  Plaintiff explained that he was having difficulty completing all his work by himself.  *See* SUMF ¶ 30; SUMF Resp. ¶ 30, ECF No. 46.  Plaintiff believes that "there was nothing nefarious or insubordinate in delegating this work."  Opp'n at 13.

On August 17, 2015, Plaintiff had a meeting with one of his supervisors where he was given a counseling memo regarding his delegation to the contractor.  SUMF ¶ 32.  At this meeting, Plaintiff "began to shake and exclaimed 'I am not a superhero' (given all that was being expected of him)," mentioned that "his medicine was not working," and stated that he submitted

a Family and Medical Leave Act ("FMLA") form.  Opp'n at 13–14.  Plaintiff claims that he had

a panic attack due to the meeting.  SUMF ¶ 32.

On August 25, 2015, Plaintiff submitted a written request for leave under FMLA.  SUMF

¶ 34.  The request indicated that Plaintiff "had been diagnosed with 'Panic disorder w/o

Agoraphobia, Asperger's Syndrome, [and] Depression.'"  SUMF ¶ 35.  Plaintiff communicated

with the FBI's reasonable-accommodation coordinator about his request on August 26, 2015.

SUMF ¶ 38.  The FBI approved Plaintiff's request and granted leave until November 4, 2015,

which was the maximum amount.  SUMF ¶¶ 42–43.

On October 22, 2015, while out on leave, Plaintiff submitted a request for reasonable

accommodation via his physician which contained the following requests:

> 1. Allow telework 2 to 3 days per week.  2. Provide flexible leave for health
> problems.  3. Provide self-paced work load and flexible hours.  4. Allow for
> breaks for use of stress management techniques.  5. Maintain open channels of
> communication.  6. Provide clearly detailed pictures of work assignments in
> writing.  7. Develop written work agreements and document changes in non-
> judgmental terms.  8. Develop strategies to deal with problems before they arise.
> 9. Provide weekly or monthly meetings to discuss production level and workplace
> issues.  10. Provide praise and positive reinforcement.  11. Avoid public
> reprimands.

SUMF ¶ 62; Compl. ¶ 49, ECF No. 1; Mem. Ex. 23.[4]  It also requested: "Allow creation of safe

space or space for stress management techniques"; "Document changes both positive and

negative in non-judgmental terms"; "Provide weekly or monthly meetings with the employee to

discuss workplace issues and production levels"; "Recognize that change in the office

environment or supervisors may be helpful"; "Educated [sic] all employees on their right to

accommodations"; "Provide sensitivity training to coworkers and supervisors"; "Do not mandate

---

[4] The parties filed all of their exhibits for each brief as single PDFs.  *See* ECF No. 45-1
(Defendant's opening brief exhibits, cited as "Mem. Ex. ##"); ECF No. 46-2 (Plaintiff's exhibits,
cited as "Opp'n Ex. ##"); ECF No. 48-1 (Defendant's reply exhibit).

employees attend work related social functions"; "Develop a procedure to evaluate the effectiveness of the accommodations."  Mem. Ex. 23; SUMF Resp. ¶ 63.  Around the same day, the FBI's reasonable-accommodation program sought additional information and documentation from Plaintiff to support the request.  SUMF ¶ 63.  The FBI also asked Plaintiff's physician to be as specific as possible in describing Plaintiff's functional limitations, how they interfere with his job, and what accommodations are needed.  SUMF ¶ 64.  On October 31, 2015, the FBI's reasonable-accommodation program emailed Plaintiff stating that they found him to be "a qualified person with a disability," but that they were unclear as to his limitations or what accommodations were necessary and required additional "medical documentation."  Opp'n at 15; Opp'n Ex. 20.

Plaintiff returned to work on November 4, 2015, at which time he was locked out of some databases needed to process visitor access requests; this was the FBI's typical practice for employees on leave for extended periods.  SUMF ¶¶ 44–45.  Plaintiff's supervisor asked Plaintiff to perform data entry, and the parties dispute whether the supervisor stated that this was temporary due to the database issue.  SUMF ¶ 46; *see* SUMF Resp. ¶¶ 46–47.  Plaintiff refused to perform the data entry, stating that it was not part of his job description, was stressful for him, and would cause him to have a panic attack.  SUMF ¶¶ 47, 50.  Plaintiff's supervisors "considered data entry to be an easy and uncomplicated task."  SUMF ¶ 51.  At a later meeting on November 4, 2015, one of Plaintiff's supervisors asked about Plaintiff's limitations, and, according to Plaintiff, asked for "personal information on his illness; the reasons he was on FMLA; and a letter within an hour."  SUMF ¶ 54; SUMF Resp. ¶ 54.  Plaintiff also claims that he was asked to "justify his salary."  Opp'n at 16.  Due to what Plaintiff perceived as harassment,

including being asked for medical documentation that he believed he had already provided, Plaintiff went to the Equal Employment Opportunity Office for about four hours.  Opp'n at 16.

Because Plaintiff would not perform the requested data entry on November 4, a meeting was held the next day on November 5, 2015.  SUMF ¶ 55.  Plaintiff claims that this meeting was held "in a public setting" because the conference room had "glass doors in plain view of all co-workers and passers-by."  Opp'n at 16–17.  Plaintiff claims that, at this meeting, one of his supervisors "indicated that if he did not perform his work, then his employment would be terminated," and "falsely accused Doe of being insubordinate in failing to provide his diagnosis and prognosis within an hour, and for not providing a doctor's note (even though he had done so)."  SUMF ¶ 56; Opp'n at 17.  Plaintiff then had a panic attack.  SUMF ¶ 57.  Plaintiff claims that he "requested the use of his cell phone" because it contained a calming app and that it "was not provided to him," but the document he cites for support states that two of his supervisors "claimed they were looking for my cellphone but they could not find it."  Opp'n at 17; Mem. Ex. 6 at FBI000117.  Two FBI agents then entered the room, which Plaintiff claims was done to either intimidate him or calm him down, based on different statements.  SUMF ¶¶ 58–59. Plaintiff was taken by ambulance to the emergency room where two police officers were, according to Plaintiff, "at the emergency room."  Opp'n at 17.

Plaintiff did not return to work after November 5, 2015.  SUMF ¶ 61.  Some time on November 5, 2015, Plaintiff's physician responded to the FBI's inquiry, saying that she needed Plaintiff's specific job duties and work environment before she could provide the requested information.  SUMF ¶ 65.

On November 20, 2015, the FBI's reasonable-accommodation program recommended the following accommodations:

> (1) Provide a safe space for stress management techniques (*e.g.*, access to Employee Assistance Program services); (2) Provide clear/detailed picture of assignments and programs in written form (*e.g.*, written job instructions, use of e-mail, written goals, etc.); (3) Develop written work agreements, including clear expectations of responsibilities and the consequences of not meeting performance standards; (4) Provide weekly and/or monthly meetings with the employee to discuss workplace issues and production levels.

SUMF ¶ 66 (internal quotation marks omitted).  These four recommendations are the same or similar to four of Plaintiff's physician's recommendations.  *See* SUMF ¶ 67.

On November 30, 2015, one of Plaintiff's supervisors emailed Plaintiff's wife, who was facilitating their communications, stating that the FBI would provide the four accommodations recommended by the FBI's reasonable-accommodation program.  SUMF ¶ 68.  The email also stated that Plaintiff could have additional leave until December 14, 2015.  SUMF ¶ 69.  Plaintiff requested further additional leave, which the FBI granted until January 21, 2016.  SUMF ¶¶ 71–73.  "At the Plaintiff's request, the FBI offered additional accommodations" on January 20, 2016, that included:

> (1) temporary reassignment for 90 days to a different supervisor beginning on January 21, 2016, and the opportunity to not report to Unit Chief Poindexter in the future; (2) the Plaintiff's supervisors would be flexible regarding the Plaintiff's return to work, including reduced duties during his transition period; (3) the Plaintiff's essential duties would be explained fully in writing; (4) a two-week period of leave without pay in the event that a new position had not been identified; and (5) review of the Plaintiff's reasonable accommodations after 90 days.

SUMF ¶ 74.  Plaintiff responded through his attorney the same day that he would not return to work on January 21, 2016.  SUMF ¶¶ 75, 77.  Plaintiff also points to a letter from his physician dated January 19, 2016, in which the physician opines that Plaintiff's "current mental health disability is directly related to his treatment by his employer."  Opp'n at 18 (citing Opp'n Ex. 8).

In February 2016, one of Plaintiff's supervisors drafted a memo summarizing Plaintiff's failure to appear for work and its negative impacts on his unit.  SUMF ¶¶ 77–78.  The FBI's

Human Resources Division proposed Plaintiff's dismissal due to "inability to maintain a regular work schedule" in a letter dated February 23, 2016.  SUMF ¶ 79.  Plaintiff's attorney responded on April 20, 2016, accusing his supervisors of "bull[ying]" Plaintiff and seeking to remove him in retaliation for filing an Equal Employment Opportunity ("EEO") complaint.  Opp'n at 18.

Also on April 20, 2016, Plaintiff requested "additional leave until his disability retirement application was decided"; Plaintiff applied for Social Security disability benefits on February 9, 2016, and Office of Personnel Management ("OPM") disability retirement benefits on March 10, 2016.  SUMF ¶¶ 80, 83–84.  The FBI granted the leave request.  SUMF ¶ 81.  OPM granted Plaintiff's application, providing disability retirement benefits beginning September 1, 2015.  SUMF ¶ 86.  Plaintiff's employment was terminated on November 4, 2016, with the decision letter stating that it was due to "Plaintiff's inability to maintain a regular work schedule."  SUMF ¶ 82.

Defendant's motion has been fully briefed.  *See* Mem. Supp. Def.'s Mot. Dismiss & for Summ. J. ("Mem."), ECF No. 45; Opp'n; Def.'s Reply Supp. Mot. Dismiss & for Summ. J. ("Reply"), ECF No. 48.[5]

### III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is

---

[5] Defendant's motion, Statement of Undisputed Material Facts, and memorandum, and Plaintiff's response to Defendant's Statement of Undisputed Material Facts and memorandum, were each filed as single ECF documents.  Page numbers used for citations to those documents are the page numbers assigned within the individual paper.

"genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court cannot make credibility determinations or weigh the evidence. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. That said, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

Defendant moves for summary judgment on Plaintiff's claims for denial of reasonable accommodation, discriminatory and retaliatory hostile work environment, and discriminatory and retaliatory termination.[6]  For the reasons given below, Defendant's motion is granted.[7]

### A.  Count I: Denial of Reasonable Accommodation

Defendant first moves for summary judgment on Plaintiff's reasonable-accommodation claim (Count I).  "[T]he Rehabilitation Act requires federal employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014) (quoting 42 U.S.C. § 12112(b)(5)(A)).[8]  "To be a 'qualified individual' entitled to the Rehabilitation Act's protections, an individual must be able to perform, 'with or without reasonable accommodation,' 'the essential functions of the employment position that such individual holds or desires.'"  *Id.*

---

[6] Defendant presents conflicting text about which counts Defendant moves to dismiss and for which Defendant moves for summary judgment.  *Compare* Def.'s Mot. Dismiss & for Summ. J. at 1, ECF No. 45 (moving to dismiss Count IV and for summary judgment on Counts I through IV pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56), *with* Mem. at 16 (describing Federal Rule of Civil Procedure 12(b)(1)), *and* Mem. at 22, 29, 35 (asking the Court to "Dismiss" Counts I through III).  Based on the character of the parties' arguments, including the lack of any significant reference to the motion-to-dismiss standard and Plaintiff's concession of Count IV, the Court interprets Defendant's motion as moving for summary judgment on Counts I through III and to dismiss Count IV.

[7] Plaintiff conceded his claim for breach of confidentiality in Count IV.  Opp'n at 10 n.1.  The Court therefore grants Defendant's motion to dismiss Count IV.

The Court previously dismissed Count V—Plaintiff's *Bivens* claim—without prejudice and advised that the Court would consider a motion for leave to amend Plaintiff's complaint regarding this claim.  *See* Mem. Op. Granting in Part Defs.' Mot. Dismiss Count V of the Compl. at 6, ECF No. 27; *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  However, Plaintiff never sought leave to amend.  Mem. at 42 n.12.

[8] The Rehabilitation Act "directs courts to employ the standards of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, in evaluating suits that, as relevant here, allege that an employer unlawfully denied an accommodation."  *Solomon*, 763 F.3d at 5.

(quoting 42 U.S.C. § 12111(8)).  "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires"; it "does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n).  Therefore, to avoid summary judgment, a plaintiff must come forward with sufficient evidence from which a reasonable jury could conclude that (1) the plaintiff was disabled, (2) the employer had notice of the disability, (3) the plaintiff could perform the essential functions of the position, with or without reasonable accommodation, and (4) the employer denied the plaintiff's request for reasonable accommodation.  *Solomon*, 763 F.3d at 9.  Defendant does not contest the first or second element with respect to Plaintiff's reasonable-accommodation claim.[9]

### 1.  Qualified Individual

Defendant's first argument for summary judgment for lack of reasonable accommodation is that Plaintiff was not a qualified individual because Plaintiff could not perform the essential functions of the position even with reasonable accommodation.  *See, e.g.*, Mem. at 22–24.  On this issue, Defendant first argues that "regular attendance" at work is an essential function for Plaintiff's position and that Plaintiff demonstrated his inability to meet this essential function by appearing for work only two partial days over approximately six months.  *See* Mem. at 22–23.  But even assuming that regular attendance at work is an essential function, this isolated inquiry is not sufficient to demonstrate that Plaintiff could not perform the essential functions of his position "*with* . . . reasonable accommodation."  *Solomon*, 763 F.3d at 9 (emphasis added).

Defendant's second argument on this issue goes further by arguing that "Plaintiff has affirmatively claimed that he was totally disabled as of August 17, 2015."  Mem. at 23.  In other

---

[9] Defendant does contest issues regarding notice of Plaintiff's disability with respect to other claims.

words, Defendant argues that because Plaintiff supposedly admitted that he was "totally disabled" as of this date, he could not perform the essential functions of his position even with reasonable accommodation.  Defendant cites numerous pieces of evidence in support of this assertion.  A document purporting to be Plaintiff's "Application Summary for Disability Insurance Benefits" dated February 9, 2016, contains the following statements from Plaintiff: "I became unable to work because of my disabling condition on August 17, 2015.  I am still disabled."  Mem. at 23 (cleaned up) (quoting Mem. Ex. 3, ECF No. 45-1 at 129–30).  Defendant asserts that Plaintiff "revealed in his deposition that any accommodations offered by the FBI would not have made any difference to his ability to return to work after November 5, 2015."  Mem. at 23 (citing SUMF ¶ 70).  Similarly, Defendant asserts that "Plaintiff also testified that he could not have returned to work in January 2016 regardless of any accommodations the FBI offered" because he testified "I never, never thought of going back."  Mem. at 23–24 (quoting SUMF ¶ 75).  Defendant notes that Plaintiff's physician stated that by January 2016 Plaintiff was unable to work even with reasonable accommodations and that Plaintiff "was permanently disabled following a hospitalization on December 28, 2015."  Mem. at 24 (citing Hayden Dep. 83:23–84:13, 84:22–85:2, Mem. Ex. 11).  Last, Defendant argues in a footnote that "[t]he fact that Plaintiff's disability benefit application was granted by the Office of Personal Management ('OPM') supports the Defendant's argument, as well as Plaintiff's own statement that he was unable to work."  Mem. at 23 n.2.[10]

---

[10] In reply, Defendant argues that Plaintiff was not a qualified individual because "entering data onto a spreadsheet is an essential component of the visitor access request process."  Reply at 4–6.  But Defendant did not make this argument in his opening brief on this issue.  He only made data-entry arguments regarding whether Defendant offered reasonable accommodations.  Therefore, the Court will not consider this argument.

Plaintiff responds with evidence that he was able to work.  He cites an FMLA form completed by his physician on August 25, 2015, "stating that Doe was able to perform his job duties."  Opp'n at 23 (citing Opp'n Ex. 21).  Plaintiff also points to his "attempt to do his job on November 4, 2015 and November 5, 2015," noting that he only "became totally incapacitated and unable to work" after his supervisors "ignored" his physician's request for reasonable accommodations.  *Id.*  According to Plaintiff, the FBI's Reasonable Accommodations Committee concluded that Plaintiff was entitled to relief under the Rehabilitation Act.  Opp'n at 23.[11] Plaintiff also notes that his physician stated in a letter dated October 22, 2015, that "Plaintiff's prognosis was excellent if given the accommodations to succeed at work."  Opp'n at 24.[12]  His physician also wrote in an August 25, 2015 report "indicat[ing] that Plaintiff was not totally disabled from work as of that date."  Opp'n at 23–24.  This appears to refer to the physician checking a box for "No" in response to the question "Is the employee unable to perform any of his/her job functions due to the condition?"  Opp'n Ex. 21, ECF No. 45-1 at 333.  Regarding Defendant's reference to Plaintiff's disability-benefits application, Plaintiff argues that he could "still be considered a qualified individual with a disability, notwithstanding his statements" in his applications, citing *Solomon v. Vilsack* for support.  Opp'n at 24; 628 F.3d 555 (D.C. Cir. 2010).

Determining Plaintiff's ability to perform the essential functions of his position with reasonable accommodations entails determining (1) which functions are essential for his position, (2) what reasonable accommodations would entail, and ultimately, (3) whether Plaintiff could perform those essential functions with those reasonable accommodations.  Defendant only

---

[11] The Court cannot locate the cited evidence supposedly supporting this assertion, but Defendant does not contest it and it would not change the Court's ultimate decision on this issue were it not true.

[12] More precisely, the letter appears to state that Plaintiff's "prognosis is good and can be excellent if given accommodations to facilitate success at work."  Opp'n Ex. 18.

advances significant argument that one function of Plaintiff's position is essential: regular

attendance.  *See* Mem. at 22.  Plaintiff does not dispute that regular attendance is an essential

function of his position.  The Court therefore assumes without deciding that regular attendance is

an essential function of Plaintiff's position.

Based on the parties' briefing for the essential-functions inquiry, Defendant has not

shown that no reasonable jury could find that Plaintiff could regularly attend work with

reasonable accommodation, at least for some of the relevant periods of time.  Defendant's

argument on this issue rests on Plaintiff's and Plaintiff's physician's statements regarding

Plaintiff's inability to work.  But these are insufficient to grant summary judgment to Defendant

on this issue for two reasons.

First, the statements cited by Defendant are not precisely on point.  For example, in

support of Defendant's assertion that "Plaintiff has affirmatively claimed that he was totally

disabled as of August 17, 2015," Defendant points to the following statement by Plaintiff: "I

became unable to work because of my disabling condition on August 17, 2015.  I am still

disabled." Mem. at 23 (cleaned up) (quoting Mem. Ex. 3, ECF No. 45-1 at 129–130).  But this

does not unambiguously state that Plaintiff could not regularly attend work with reasonable

accommodations.  It could be interpreted as Plaintiff stating that he is unable to work without

reasonable accommodations.  Defendant also points to Plaintiff's supposed statement "in his

deposition that any accommodations offered by the FBI would not have made any difference to

his ability to return to work after November 5, 2015." Mem. at 23.[13]  But Plaintiff's phrasing is

---

[13] Plaintiff admits in his brief that he "became totally incapacitated and unable to work"
after November 5, 2015.  Opp'n at 23.  But Defendant did not move for summary judgment on
this issue for discrete time periods.  Therefore, if a reasonable jury could find that Plaintiff was a
qualified individual during any relevant time, the motion must fail in its entirety on this issue.

ambiguous.  It could refer to any accommodations actually offered by the FBI, or any

accommodations that could potentially be offered by the FBI.  Plaintiff's deposition clarifies that

his response concerned either "accommodations that the FBI provided" or accommodations

"given by [Plaintiff's] doctor," Doe Dep. 102:3–6, Mem. Ex. 1, but not any and all potential

accommodations.

Second, Plaintiff has presented evidence to the contrary, as explained above, such as his

physician indicating that he was able to perform his job duties.  The evidence presented by

Plaintiff is no more on point than Defendant's, but the burden here is on Defendant to show that

no reasonable jury could find for Plaintiff.  Defendant has not made such a showing on this

question regarding regular attendance.  It is unnecessary to individually analyze the second two

elements laid out above—(2) what reasonable accommodations would entail or (3) whether

Plaintiff could perform those essential functions with those reasonable accommodations—

because Defendant rested his argument on evidence that did not depend on defining those

elements further, e.g., supposed admissions that Plaintiff was unable to work regardless of

accommodations.  Based on the scope of Defendant's challenge to the qualified-individual

requirement and the evidence presented by both sides, the Court cannot say that no reasonable

factfinder could find that Plaintiff was a qualified individual for at least some period of the

relevant time.

### 2.   Denial of Reasonable Accommodation

Defendant's second argument for summary judgment for lack of reasonable

accommodation is that Defendant did not deny Plaintiff's request for a reasonable

accommodation.  *See, e.g.*, Mem. at 24–29.  As stated above, "the Rehabilitation Act requires

federal employers to make 'reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability.'" *Solomon*, 763 F.3d 1 at 5 (quoting 42 U.S.C. § 12112(b)(5)(A)).  Accordingly, to succeed on a failure-to-accommodate claim, the employer must have denied the plaintiff's request for reasonable accommodation.  *See id.* at 9.  To determine appropriate reasonable accommodations, employers should "initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).  "[A]n employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc). "Determining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry" because "the contours and demands of an employment position and the capacities of a workplace can vary materially from employer to employer." *Solomon*, 763 F.3d at 9.  "[T]o the extent an ADA discrimination claim centers on a request for a workplace accommodation, there must be some causal connection between the major life activity that is limited and the accommodation sought." *Desmond v. Mukasey*, 530 F.3d 944, 959 (D.C. Cir. 2008) (alteration in original) (quoting *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007)).  "For those reasons, it is rare that any particular type of accommodation will be categorically unreasonable as a matter of law." *Solomon*, 736 F.3d at 10.  To "establish that [a plaintiff's] request was 'denied,' [a plaintiff] must show either that the [agency] in fact ended the interactive process or that it participated in the process in bad faith." *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (second and third alterations in original) (quoting *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)).

In Defendant's view, the FBI both offered reasonable accommodations and did not end the interactive process of determining reasonable accommodations.  When Plaintiff requested

leave near the beginning of the relevant events, the FBI approved of Plaintiff using the maximum amount of FMLA leave and then allowed Plaintiff to take leave without pay, totaling 847 hours of leave. *See* Mem. at 35–36.  After Plaintiff provided a list of requested accommodations on October 22, 2015, "[t]he FBI requested additional information and medical documentation to support such requests."  Mem. at 24–25.  On November 20, 2015, the FBI agreed to four accommodations, including (1) providing a safe space for stress management, (2) providing clear, detailed descriptions of assignments and programs in writing, (3) developing written work agreements that document clear expectations and consequences, and (4) providing weekly or monthly meetings to discuss workplace issues and Plaintiff's work output.  Mem. at 25.  These cover roughly four of Plaintiff's requests made on October 22.  On January 20, 2016, the FBI offered additional accommodations after a call with Plaintiff's attorney: (1) temporary reassignment to a different supervisor for ninety days, (2) flexibility for Plaintiff's return to work, including reduced duties, (3) explaining Plaintiff's essential duties in writing, (4) two weeks of leave without pay if a new position had not been identified, and (5) review of the accommodations in ninety days.  Mem. at 25–26.  Defendant argues that, as opposed to Defendant denying reasonable accommodations, Plaintiff rejected these offers by not returning to work.  Mem. at 26; *see also* Mem. at 24 ("[T]he FBI provided and offered numerous reasonable accommodations to Plaintiff, which were, for all intents and purposes, rejected.").  Defendant also argues that many of Plaintiff's requested accommodations were unreasonable.  For example, Plaintiff requested a "self-paced work load and flexible hours," which Defendant believes is vague and "at odds with the nature of Plaintiff's position."  Mem. at 27.  Last, regarding Plaintiff's refusal to perform data-entry work, Defendant points to Plaintiff's admission in his deposition that data entry is "part of the process" of processing requests and to the lack of

explanation in his deposition as to why any medical condition would prevent data-entry work. Mem. at 28–29.

Rather than addressing the reasonableness of the FBI's proposed accommodations, Plaintiff's response focuses on how the FBI "acted" in the interactive accommodation process. Opp'n at 25.  Namely, Plaintiff faults the FBI for failing to implement the accommodations listed in his physician's letter before he returned to work on November 4, 2015.  Opp'n at 25–26.  He asserts that it should not have required an interactive process to accept and implement the accommodations listed by his physician.  Opp'n at 26.  Because the FBI failed to have these implemented before November 4, 2015, on that day his supervisor "began to discuss private information in a public area"—which perhaps Plaintiff believes contravened his physician's recommendation of "no public reprimands"—and asked Plaintiff to do data entry, which Plaintiff advised "would cause him to undergo a panic attack."  Opp'n at 26–27.  There were additional "public" meetings during which his supervisors made supposedly inappropriate requests and remarks to him, resulting in a panic attack.  *See* Opp'n at 27.  Plaintiff views this as "bullying[,] . . . heavy-handed and inflexible."  Opp'n at 27.  Therefore, according to Plaintiff, "the FBI bears the responsibility for the Plaintiff's inability to work after November 5, 2015." Opp'n at 25 (emphasis removed).

Although Plaintiff does not directly address the reasonableness of the FBI's proposed accommodations, he seems to argue that a reasonable jury could find that the FBI's offered accommodations were not reasonable.  However, the thrust of his argument is aimed at the FBI's actions during the accommodation process, rather than the offered accommodations themselves. He argues that there is a dispute of material fact as to "whether the FBI acted properly in delaying and in denying Dr. Hayden's October 22, 2015 accommodation requests; and whether

the actions of the supervisors can really be construed as a reasonable accommodation." Opp'n at 28. He rhetorically asks why he was reprimanded in a public setting and why he was not praised and positively reinforced. Opp'n at 28.

Plaintiff's criticisms of how the FBI handled the accommodation requests are misplaced within his claim for denial of reasonable accommodation. He seems to argue that the FBI failed to provide him reasonable accommodations because, during the interactive process of determining accommodations, the FBI acted contrary to some of his accommodation requests, which obviously had not been accepted by the FBI at that time. The closest these criticisms come to legal relevance for Plaintiff's reasonable-accommodation claim is an argument that through the FBI's actions it effectively ended the interactive process and denied him reasonable accommodations, which is discussed below. Other than that issue, Plaintiff's concerns about how he was treated during the interactive accommodation process could only relate to other claims, such as his hostile-work-environment claims.

The Court holds that Plaintiff was not denied reasonable accommodations because Plaintiff broke off the interactive process of determining reasonable accommodations, not the FBI. The undisputed facts show that the FBI provided significant leave and made at least two offers of accommodations, with the second offer building on the first. Although the November 4 and 5, 2015 meetings were, according to Plaintiff, confrontational and unpleasant, they do not demonstrate an unwillingness on the FBI's part to engage in the accommodation process, especially considering the additional accommodations offered in January 2016. "[F]ar from finally denying [Plaintiff's] request for an accommodation, the record shows that [the FBI] was engaged in the 'interactive process' that is often necessary to determine a reasonable accommodation." *Minter*, 809 F.3d at 70. Nothing about these offers or any other FBI actions

19

indicates that these offers were made in bad faith.  Even with the facts viewed in the light most

favorable to Plaintiff, no reasonable jury could find that the FBI had ended the accommodation

process, officially or constructively through bad faith.

Plaintiff's main argument that he was denied reasonable accommodations is that the FBI

did not accept and implement all the accommodations listed in his physician's October 22, 2015,

letter by November 4, 2015.  *See* Opp'n at 25 ("When Plaintiff returned to work on November 4,

2015, the FBI supervisors acted in a manner contrary to Dr. Hayden's recommendations.");

Opp'n at 26 ("The FBI should have acted diligently in approving and enacting Dr. Hayden's

requested accommodations as stated in her October 22, 2015 letter."); *id.* ("Clearly, it could not

(and should not) require a long interactive and deliberative process to implement Dr. Hayden's

accommodation requests."); Opp'n at 28 (referring to the FBI "denying Dr. Hayden's October

22, 2015 accommodation requests").  This is unpersuasive for two reasons.  First, the FBI's

decision not to fully implement the proposed accommodations did not constitute a denial of

reasonable accommodations, even if the accommodations proposed by Plaintiff were at least

temporarily denied.  As noted above, denial occurs when the employer "in fact" ends the

interactive process or participates in it in bad faith.  *Minter*, 809 F.3d at 69.  The FBI did not end

the interactive process "in fact," as shown by an email from the FBI's Acting Reasonable

Accommodation Program Coordinator to Plaintiff that "did not grant [Plaintiff's] request for an

accommodation at that time" but instead "requested more information as to Doe's reasonable

accommodation request."  Opp'n at 15 (citing Opp'n Ex. 20).  The email states that while

Plaintiff was found to be "a qualified person with a disability, it is unclear what your limitations

are and what accommodations would be necessary or effective for your situation."  Opp'n Ex.

20.  The email then asks for four categories of documentation from Plaintiff's physician: specific

20

diagnosis, prognosis, functional limitations, and description of how accommodations "will assist

in performing the essential functions of the job." *Id.*

Far from ending the process, the FBI was requesting more information just over a week

after receiving Plaintiff's request.  An employer is not required to accept every proposed

accommodation; it must only provide some reasonable accommodation.  *Aka*, 156 F.3d at 1305.

Furthermore, "[a]n employer is not required to provide an accommodation prior to receiving

medical documentation that substantiates the employee's need for accommodation." *Graffius v.*

*Shinseki*, 672 F. Supp. 2d 119, 130 (D.D.C. 2009).  Here, as of November 4, 2015, Plaintiff had

provided a long list of accommodations, the FBI had requested additional information, and

Plaintiff had not yet provided that information.  The FBI's request for additional information is

understandable given the vagueness and malleability of some of the requested accommodations,

such as "[p]rovide a self paced work load" and "[d]evelop strategies to deal with problems

before they arise."  Mem. Ex. 23.  These proposed accommodations also cannot have been

designed to be closely tied to Plaintiff's position because Plaintiff's physician did not know

Plaintiff's "specific job duties and his specific job environment" at the time, as demonstrated by

her later request for that information on November 5, 2015.  Mem. Ex. 14.  Unfortunately for

Plaintiff, this all happened only a few days before he returned to work on November 4, 2015, and

it was not until November 5 that Plaintiff's physician requested information about Plaintiff's job

duties so that she could provide the information requested by the reasonable-accommodation

program.  *See* Mem. Ex. 14.  But nothing about this process demonstrates an end to the

interactive process or raises an inference of bad faith.

Second, Plaintiff focuses on his being asked to perform data entry as an example of

denial of reasonable accommodation, but it is not clear that this contravened Plaintiff's proposed

accommodations; Plaintiff's proposed accommodations say nothing about avoiding data entry work.  *See* Mem. Ex. 23.  Regardless, it would not have been a reasonable accommodation to preclude Plaintiff from data-entry work because Plaintiff has not demonstrated any "causal connection between the major life activity that is limited and the accommodation sought." *Desmond*, 530 F.3d at 959 (quoting *Squibb*, 497 F.3d at 785).  Plaintiff's justifications are that (1) data entry was not part of his job description, (2) performing the data-entry work would cause a panic attack, and (3) he viewed the data-entry assignment "as reprisal for protected activity." Opp'n at 27.  The first justification is undercut by undisputed facts.  *See* SUMF ¶ 26 ("As part of the Plaintiff's job duties in processing a visitor access request, he needed to enter data about the request onto a spreadsheet.").  The second justification does not explain why Plaintiff's disability would lead to a panic attack; it merely states Plaintiff's prediction that a panic attack would occur.  Defendant argued that "nothing in the record" supports Plaintiff's assertion that data entry would be stressful for Plaintiff, and Plaintiff has not responded with any supporting evidence.  Mem. at 28.  When asked whether he was aware of anything about his medical condition that would preclude him from data-entry work, he responded "I don't know."  Doe Dep. 66:9–12.  Again, Plaintiff's proposed accommodations say nothing about avoiding data entry work.  Mem. Ex. 23.  The third justification is not relevant to whether Plaintiff's disability required an accommodation.  Therefore, to the extent Plaintiff argues that the FBI denied him reasonable accommodations by asking him to perform data-entry work, the Court holds that a request to avoid data-entry work was not a reasonable accommodation because Plaintiff has not demonstrated a causal connection between Plaintiff's disability and avoiding data entry.[14]

---

[14] More broadly, it is not clear that Plaintiff's proposed accommodations were violated. Plaintiff seems to argue that the events of November 4 and 5 violated the following requested accommodations: "self-paced work load and flexible hours"; "provide praise and positive

*             *             *

Plaintiff has alleged sufficient facts from which a reasonable jury could find that Plaintiff was a qualified individual, but not that the FBI denied him reasonable accommodations. Therefore, Defendant's motion for summary judgment on Count I is granted.

### B.  Count II: Hostile Work Environment

Defendant next moves for summary judgment on Plaintiff's hostile-work-environment claims (Count II).  To succeed on a discriminatory or retaliatory hostile-work-environment claim, a plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).[15]  However, this

---

reinforcement"; "no public reprimands"; "provide written job instructions."  Opp'n at 25.  But Plaintiff does not clearly explain how the facts contravened these prohibitions, despite their relative lack of specificity.  There is no allegation that Plaintiff was given a short deadline to complete a certain amount of data entry.  It is not clear what Plaintiff's supervisors would praise based on Plaintiff's actions on those days.  Plaintiff repeatedly describes meetings as happening publicly, but testified that at least one of them was in "a small conference room" with a closed glass door and that he did not know whether anyone could overhear, Doe Dep. 71:21–72:12; a discussion at his supervisor's cubicle, which is more plausibly public, was about "private information," not a reprimand, Opp'n at 26.  Given that Plaintiff had been performing data entry as part of his job for some time, there is no reason to think he needed written job instructions.  Although Plaintiff had unpleasant experiences on November 4 and 5, those experiences were not caused by his supervisors violating these proposed accommodations, which were both generalized and not tied to Plaintiff's specific position, as explained above.

[15] The parties both cite Title VII cases, or cases that themselves cite Title VII cases, in support of their Rehabilitation Act hostile-work-environment arguments.  *See, e.g.*, Mem. at 29 (citing *Welch v. Skorton*, 299 F. Supp. 3d 102, 114–15 (D.D.C. 2018) (quoting *Harris*, 510 U.S. at 21)); Opp'n at 30 (quoting *Harris*, 510 U.S. at 21).  Cases in this District have indeed used the same standard for the two.  *See, e.g.*, *Sanders v. Kerry*, 180 F. Supp. 3d 35, 44 (D.D.C. 2016) (reciting the same standard "[t]o sustain a hostile work environment claim under Title VII, the ADEA, or the Rehabilitation Act"); *id.* at 45 (citing *Harris*, 510 U.S. at 23).

standard is not tantamount to a "general civility code" for the workplace. *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting) (quoting *Oncale*, 523 U.S. at 81). "To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby 'alter[ing] the conditions of the victim's employment.'" *Id.* (quoting *Harris*, 510 U.S. at 21–22). "Whether a work environment is objectively hostile ultimately depends on the particular acts 'taken as a whole.' 'Very rarely will such fact-based determinations be appropriate for determination on summary judgment,' particularly given that the Court is not permitted to weigh the evidence or assess the credibility of witnesses." *Coulibaly v. Pompeo*, No. 14-cv-712, 2020 WL 1536185, at *4 (D.D.C. Mar. 31, 2020) (citations omitted) (quoting *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 353 (D.D.C. 2013); *Armstrong v. Reno*, 172 F. Supp. 2d 11, 24 (D.D.C. 2001)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (citing *Oncale*, 523 U.S. at 78). The test has both subjective and objective dimensions: the plaintiff must "subjectively perceive the environment to be abusive" and the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21.

Defendant makes two arguments for summary judgment on Plaintiff's hostile-work-environment claim: (1) the alleged harassment was not based on Plaintiff's disability, and (2) the alleged harassment was not severe or pervasive. On the first issue, Defendant argues that

Plaintiff's supervisors learned about his medical conditions on August 25, 2015. *See* Mem. at

30. Therefore, according to Defendant, any alleged harassment by Plaintiff's superiors before

then could not have been based on Plaintiff's disability. *Id.* Defendant then focuses on the

second issue—whether the alleged harassment was severe or pervasive—looking only at alleged

harassment that occurred after Plaintiff's supervisors learned of his disability, i.e., August 25,

2015. *See* Mem. at 31. Defendant highlights that Plaintiff only came to the workplace on two

days, November 4 and 5, 2015, after his supervisors learned of his disability. *Id.* In other words,

according to Defendant, the only alleged harassment occurring after Plaintiff's supervisors

learned of his disability "were during the work-related meetings on these two days." *Id.* There

were no comments at those meetings referencing Plaintiff's disability. Mem. at 31–32. Even

including alleged harassment before August 25, 2015, Defendant argues that the sum of alleged

conduct was not objectively severe or pervasive and was largely related to work matters. *See*

Mem. at 32–35. Defendant cites several cases rejecting hostile-work-environment claims as

insufficiently severe or pervasive that he contends are factually analogous. *See, e.g.*, *Welch v.*

*Skorton*, 299 F. Supp. 3d 102, 114–15 (D.D.C. 2018); *Singh v. U.S. House of Representatives*,

300 F. Supp. 2d 48, 54–57 (D.D.C. 2004).

     Plaintiff first responds that his "supervisors plausibly regarded Plaintiff as being

disabled" or "different" before August 25, 2015. Opp'n at 31. He points to a supervisor

"acknowledg[ing] that she observed that Plaintiff had issues" in July 2015. *Id.* He also emailed

that supervisor at the end of July "explaining that he had anxiety and was on medication." *Id.*

And on August 17, 2015, in a meeting with two of his supervisors, he "began shaking and stated

'my brain has snapped and the medicine is not working.'" Opp'n at 31–32. After that meeting,

one supervisor observed: "I knew something was wrong, possibly the medication he was on was having an effect on him."  Opp'n at 32 (quoting Opp'n Ex. 3 at FBI000161).

Plaintiff then argues that the alleged harassment was severe or pervasive.  As evidence, Plaintiff points to his accounting (which is in some respects disputed) of the following events:

1. In April or May 2015, a supervisor "joked" that Plaintiff was being fired, making Plaintiff feel "confused and shocked" and resulting in another supervisor "comment[ing] that it was not appropriate."  Opp'n at 32.

2. In the summer of 2015, after "Plaintiff became flustered in a team building exercise," a supervisor said that Plaintiff was "unworthy to volunteer in front of the unit," resulting in Plaintiff feeling "humiliated and upset" and coworkers commenting that it was inappropriate, *id.*, though the supervisor "told him it was okay."  Opp'n at 12.

3. "In July 2015, Plaintiff was accused of being negligent" regarding a mistake made at work, which he argues resulted from lack of training rather than negligence, with a supervisor commenting that she was "offended by the tone and gestures exhibited during the meeting."  Opp'n at 32.

4. On November 4, 2015, "Plaintiff was not permitted to review his emails" after being absent for several weeks.  Opp'n at 33 (emphasis removed).

5. On November 4, 2015, Plaintiff was instructed to perform data-entry work, which he viewed "as an attempt to set him up to fail and reprisal."  *Id.*

6. On November 4, 2015, in a meeting with his supervisors, Plaintiff was instructed to "justify his salary" and "provide his medical information within an hour," even though he had already submitted documentation "to the Health Care Unit and the

Reasonable Accommodations Committee," and was accused of being insubordinate. *Id.* (emphasis removed).

7.  On November 5, 2015, in a meeting with his supervisors, Plaintiff was "publicly ridiculed . . . in a fishbowl meeting room," his "supervisors attempted to serve Plaintiff with letters of counseling," he was threatened with termination if he left the meeting, and he was accused of being insubordinate for not providing a doctor's note justifying his FMLA leave and not timely providing the email requested the day before, the latter of which Plaintiff claims he provided.  Opp'n at 34 (emphasis removed).

8.  As a result of the November 5, 2015 meeting, two armed agents entered the conference room, Plaintiff could not use his cell phone's calming app, he left the meeting in an ambulance, and "[t]he FBI sent two (2) DC police officers to the emergency room where plaintiff was being treated for panic attacks," *id.*—although Plaintiff cites a document stating that the agents were called "to try to calm me down," two of his supervisors attempted to find his phone, Mem. Ex. 6 at FBI000117; Opp'n at 17 (citing Mem. Ex. 6), and Plaintiff testified that he had no information supporting the claim that the FBI called the D.C. police officers to the hospital, Doe Dep. 86:20–87:1.

Plaintiff then lays out several "facts demonstrating the severity and offensiveness of the Defendant's conduct."  Opp'n at 34.  Namely, he points to:

1.  In contravention of his physician's recommendation to provide Plaintiff "clear, written assignments and expectation," Plaintiff's supervisors assigned him different duties on November 4, 2015, that were not in writing.  Opp'n at 34–35.

2. Despite their familiarity with his past issues, on November 4, 2015, Plaintiff's "supervisors sought to serve disciplinary papers on him and triggered another panic attack."  Opp'n at 35.

3. Plaintiff's long tenure at the FBI.  *Id.*

4. Argument that the communications here were "more than criticism of the employee[']s work, yelling or shouting," citing *Singh*, 300 F. Supp. 2d 48.  Opp'n at 35.

5. The November meetings being held in public settings after the FBI knew of "Plaintiff's precarious mental condition."  Opp'n at 35–36.

6. Being asked to provide medical documentation despite having "previously submitted medical documentation to the FBI Nurse."  Opp'n at 36.

7. Plaintiff's "full-blown panic attack" on November 5, 2015, and subsequent "full blown PTSD."  *Id.*

Regarding the timeline of Plaintiff's supervisors learning of his disability, which is relevant to whether any harassment could have been because of that disability, the evidence Plaintiff cites begins only in July 2015.  But Plaintiff proceeds in his brief to reference an event from "April or May 2015."  Opp'n at 32.  Plaintiff has therefore presented no evidence that this event could have constituted harassment because of his disability.  For the remaining events, a reasonable jury could conclude based on the evidence that Plaintiff's supervisors knew he had a disability during at least some of the alleged harassment.  Plaintiff's evidence is not overly convincing on this point for events before August 25, 2015, but resolving this fact-intensive question would require drawing inferences from statements and actions of Plaintiff's superiors and weighing evidence.  *See Czekalski*, 475 F.3d at 363 (explaining that on summary judgment a

court must "eschew making credibility determinations or weighing the evidence").  The Court

may not perform such analysis on summary judgment, and therefore will not grant summary

judgment for Defendant on the issue of whether any alleged harassment was based on Plaintiff's

disability.

Although courts should rarely decide on summary judgment whether a work environment

was sufficiently severe or pervasive, in this case it is clear that no reasonable jury could find that

the alleged harassment was severe or pervasive, even when all facts are viewed in the light most

favorable to Plaintiff.  None of the conduct identified by Plaintiff contains explicit reference to

Plaintiff's disability, and every incident is at least somewhat related to the operation of a

workplace, including the interactive accommodation process.  Even if Plaintiff felt that he was

being harassed when supervisors joked that Plaintiff was being fired, supposedly told Plaintiff

that he was unworthy to volunteer in an exercise, accused Plaintiff of negligence when Plaintiff

admittedly made a mistake, publicly ridiculed Plaintiff on few days, and everything else listed

above, it would not rise to the severe or pervasive level necessary "to pollute the work

environment" and "alter[] the conditions" of Plaintiff's employment.  *See Vance*, 570 U.S. at 452

(Ginsburg, J., dissenting).

The only case cited by Plaintiff as a factual comparison is *Singh*, 300 F. Supp. 2d 48, but

it does not support Plaintiff's argument.  According to Plaintiff, *Singh* concerned "criticisms of

the employee[']s work, yelling [and] shouting."  Opp'n at 35.  But that description waters down

the conduct in *Singh*.  The plaintiff in *Singh* described her supervisor as "hostile, patronizing and

frequently abusive."  *Singh*, 300 F. Supp. 2d at 54.  The supervisor "froze Ms. Singh out of

important meetings and humiliated her at those meetings she did attend," and in a closed-door

meeting stated "all the things [the plaintiff] was doing wrong" and told the plaintiff "to shut up

and sit down" when the plaintiff asked to leave.  *Id.*  In another meeting, the supervisor

"scream[ed]" at the plaintiff.  *Id.*  The plaintiff cited several other examples of mistreatment

"such as not being assigned a parking space, having difficulty obtaining supplies, being treated

'as if [she] were invisible' by [the supervisor], *i.e.*, she was purportedly overlooked at staff

meetings, denied work in areas of her expertise, isolated from other staff members, excluded

from high-level meetings, denied opportunities for professional growth, and denied the

opportunity to attend" most of the "festivities surrounding her daughter's college graduation."

*Id.* (first alteration in original).  The plaintiff stated that the supervisor was "constantly hostile

and hypercritical, kept [the plaintiff] out of important meetings, interrupted the flow of her work

to interpose critical editing, credited all complaints against Ms. Singh, and ignored all praise."

*Id.* at 55.

Plaintiff's facts demonstrate conduct that is no more severe or pervasive than the conduct

in *Singh*.  Like in *Singh*, Plaintiff believe that he was humiliated by his superiors in a small

number of instances.  It is not clear whether every perceived humiliation in *Singh* was work

related, but here they were.  None of the incidents described by Plaintiff are unrelated to work,

with most relating to Plaintiff's work performance.  *See Welch*, 299 F. Supp. 3d at 114–15 ("Mr.

Welch's claims appear to primarily involve work-related actions by supervisors, and courts have

generally rejected such claims as sufficient to constitute a hostile work environment.").  And

Plaintiff "was in no way physically threatened by any of the alleged incidents."  *Id.* at 114.

"Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of

disapproval) are the kinds of normal strains that can occur in any office setting . . . ."  *Singh*, 300

F. Supp. 2d at 56; *see also Richard v. Bell Atl. Corp.*, 209 F. Supp. 2d 23 (D.D.C. 2002) ("[T]he

type of conduct that [Ms.] Walton complains of, i.e., rude comments, unjust criticism, and

stressful working conditions, amount to 'ordinary tribulations of the workplace' that [is] insufficient as a matter of law for a hostile environment case." (alterations in original) (citations omitted)).  Although the treatment Plaintiff received may have been "disrespectful and unfair," that "does not mean that [Plaintiff] was subjected to an illegal hostile work environment."  *Singh*, 300 F. Supp. 2d at 57.  Like in *Singh*, where summary judgment was granted to the employer on whether the work environment was hostile, Plaintiff has not produced sufficient evidence such that a reasonable jury could find that he was subjected to severe or pervasive harassment.

Defendant cites additional analogous cases.  In *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105 (D.D.C. 2004), *aff'd*, No. 04-5181, 2004 WL 2348142 (D.C. Cir. Oct. 19, 2004), the court granted summary judgment against the plaintiff's hostile-work-environment claim based on facts that are at least as severe or pervasive as Plaintiff's.  The plaintiff in *Gustave-Schmidt* alleged that

> (1) she was falsely accused of forgery and subjected to an investigation and possible suspension; (2) she was closely monitored and followed by a co-worker; (3) she was yelled at by her Supervisor in April of 1999 in close proximity to her fellow co-workers; and (4) her Supervisor "used ethnic slurs such as 'spic,' when speaking about Hispanics to [her] . . . [and] also told her that 'older females should not be in the field of economics,' and 'that older women didn't make it as managers.'

*Id.* at 121 (alterations in original).  Although there may have been fewer discrete incidents in *Gustave-Schmidt*, the fourth category—using ethnic slurs for Hispanics and making facially discriminatory statements about older women directly to plaintiff, who was "a forty-eight year-old Hispanic woman," *id.* at 108, 121—constitutes harassment more severe or pervasive than anything Plaintiff describes.  Additionally, there are similarities with the *Gustave-Schmidt* facts; Plaintiff also asserts that he was the subject of false accusations and "publicly ridiculed."  *See id.* at 121; Opp'n at 32, 34.

\*               \*               \*

Plaintiff has alleged sufficient facts from which a reasonable jury could find that

Plaintiff's supervisors were aware of his disabilities for at least some of the relevant time period,

and therefore that certain actions may have been taken because of Plaintiff's disability, but not

that there was a severe or pervasive work environment.[16]   Therefore, Defendant's motion for

summary judgment on Count II is granted.

### C.  Count III: Termination

Last, Defendant moves for summary judgment on Plaintiff's termination claim (Count

III).  "[I]n considering an employer's motion for summary judgment or judgment as a matter of

law [in a disparate treatment suit where an employee has suffered an adverse employment action

and an employer has asserted a legitimate, nondiscriminatory reason for the decision], the district

court must resolve one central question: *Has the employee produced sufficient evidence for a*

*reasonable jury to find that the employer's asserted non-discriminatory reason was not the*

*actual reason and that the employer intentionally discriminated against the employee on the*

*basis of race, color, religion, sex, or national origin?*"  *Doak v. Johnson* ("*Doak I*"), 19 F. Supp.

3d 259, 271–72 (D.D.C. 2014) (second and third alterations in original) (quoting *Brady v. Off. of*

*Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015).

The parties agree that this Title VII standard applies to this discriminatory termination issue.  *See*

Mem. at 19–20 (citing *Brady*, 520 F.3d at 494); Opp'n at 41 (same).  Similarly, the ultimate

question for resolving a retaliatory termination claim where the employer has asserted a

legitimate, nonretaliatory reason is whether the plaintiff has come forward with "'sufficient

---

[16] Plaintiff's retaliatory hostile-work-environment claim must fail as well because it encompasses even fewer incidents of alleged harassment, and therefore is even further from being severe or pervasive.  The earliest alleged protected activity that Plaintiff describes is his FMLA leave request on or about August 25, 2015, *see* Opp'n at 38, compared to the first alleged disability-based harassment which occurred in April or May 2015, *see* Opp'n at 32.

evidence to create a genuine dispute on the ultimate issue of retaliation' by showing either directly that 'a discriminatory reason more likely motivated the employer,' or indirectly that 'the employer's proffered explanation is unworthy of credence.'" *Doak v. Johnson* ("*Doak II*"), 798 F.3d 1096, 1107 (D.C. Cir. 2015) (quoting *Solomon*, 763 F.3d at 14).  The parties agree that this is the ultimate question.  *See* Opp'n at 37 ("If the defendant comes forward with [evidence of a nonretaliatory reason], the plaintiff must then demonstrate the defendant's explanation is not believable or that the defendant was motivated by discriminatory animus."); Mem. at 21 ("If the defendant offers a legitimate, non-retaliatory reason for its decision, then the court must determine whether there is sufficient evidence for a reasonable fact finder to conclude the defendant's asserted reason for the decision was a pretext for retaliation.").

Defendant argues that no reasonable jury could find either that (1) the actual reason for Plaintiff's firing was other than Plaintiff's failure to appear for work, or (2) Plaintiff was intentionally fired on the basis of his disability or in retaliation for protected activity.  *See* Mem. at 35–40.  For the approximately fourteen-month period between August 18, 2015, and the day that Plaintiff was terminated, November 4, 2016, "Plaintiff appeared for work only on two (partial) days."  Mem. at 35.  Plaintiff's coworkers had to perform the work that Plaintiff would have otherwise handled.  Mem. at 36.  In February 2016, one of Plaintiff's supervisors "drafted a memorandum that summarized Plaintiff's failure to appear for work."  Mem. at 35.  In a letter dated February 23, 2016, the "FBI's Human Resources Division proposed the termination of Plaintiff's employment due to his failure to appear for work" and "inability to maintain a regular work schedule."  Mem. at 36 (citing and quoting Mem. Ex. 17 at FBI000293).  When Plaintiff's employment was terminated in November 2016, "[t]he final decision letter stated that it was based on Plaintiff's inability to maintain a regular work schedule."  Mem. at 37.

Plaintiff responds that "Defendant's stated reasons are a pretext" and that "Defendant was motivated by discriminatory animus and reprisal."  Opp'n at 42.  In support, Plaintiff points to all the evidence recounted above regarding the reasonable-accommodation and hostile-work-environment claims.  *See* Opp'n at 42–44.  He characterizes these as "extreme bullying tactics which can only be interpreted to mean that the Defendant wanted to fire him."  Opp'n at 44. Plaintiff also points to the FBI's "delayed and denied implementation of [his physician's] requests for reasonable accommodation."  Opp'n at 45.  Similarly, Plaintiff argues that the facts demonstrate "reprisal for Plaintiff's invocation of the accommodations process."  *Id.*  He points to the fact that the proposal to remove him occurred about three months after the November meetings.  *Id.*

The question for the Court is not whether it could imagine any remote possibility of Defendant's proffered justification being pretextual for discriminatory or retaliatory firing; it is whether Plaintiff has presented evidence from which a reasonable jury could draw such a conclusion.  The Court holds that no reasonable jury could find from the evidence presented that the FBI's decision to terminate Plaintiff's employment was based on something other than his failure to appear for work.  The undisputed facts show that Plaintiff did not come to work or otherwise do his job for many months and gave no indication that the FBI's proposed accommodations would be accepted, or even productively negotiated against in an interactive process.  This case is similar to *Doak*, where the employer's non-discriminatory reason for proposing to remove the plaintiff was "her inability to maintain a regular schedule and presence in the workplace, and her frequent and unpredictable absences without leave."  *Doak II*, 798 F.3d at 1107.  There, the plaintiff missed forty to fifty percent of her work hours over a ten-month period.  *Doak I*, 19 F. Supp. 3d at 273.  Here, Plaintiff's absenteeism was more severe, having

been essentially fully absent from August 2015 to February 2016, when his termination was proposed, and fully absent from February 2016 to November 2016, when he was terminated. The employer in *Doak* explained how the plaintiff's absences negatively affected her team, *id.*, as has the FBI here, Mem. at 36. Plaintiff has no evidence to the contrary. Last, the plaintiff in *Doak* argued that her absences were due to her employer's failure to accommodate her disability, but the Court explained that the separate failure-to-accommodate claim is the proper venue for such argument. *Doak I*, 19 F. Supp. 3d at 273. Here, Plaintiff argues the same and, as set forth above, that claim fails. *See* Opp'n at 45 (arguing that "the FBI's stated reasons for its removal action" were pretextual in part because "the FBI delayed and denied implementation of Dr. Hayden's requests for reasonable accommodation").

One difference from *Doak* is that there were fewer facts proffered in *Doak* that the plaintiff argued were indicative of discriminatory or retaliatory intent. For discriminatory intent, the plaintiff pointed to only the alleged failure to accommodate, which the Court deemed irrelevant to that question. *See Doak I*, 19 F. Supp. 3d at 273. For retaliatory intent, all that the plaintiff pointed to were the temporal proximity between her accommodation requests and proposed termination and that her attendance was improving (which, according to the Court of Appeals, "still fell short of what her job requires"). *See Doak II*, 798 F.3d at 1107–08. Here, by contrast, Plaintiff identifies a few incidents that he believes demonstrate impermissible intent. For example, Plaintiff describes his supervisor asking why Plaintiff's work was not being completed and asking Plaintiff to sign a letter about his performance despite him recently returning from leave. Opp'n at 43–44. Plaintiff argues that this letter and "the larger context" show "that the FBI viewed Plaintiff as different; and the FBI was going to take[] steps to remove him." Opp'n at 44. He also argues that "the language that was used" by one of his supervisors,

such as allegedly stating that Plaintiff was "unworthy to volunteer in front of the unit," shows that the supervisor "viewed Plaintiff as being disabled" even if the supervisor "did not have actual knowledge of Plaintiff's diagnosis." Opp'n at 32–33.[17]  However, those incidents are not substantial enough to allow a reasonable jury to find for Plaintiff.  They must be viewed in the context of Defendant's undisputed attempts at accommodation, including allowing Plaintiff to take substantial leave, proposing accommodations covering essentially four of Plaintiff's physician's recommendations, and subsequently proposing additional accommodations.  Even when the facts are viewed in the light most favorable to Plaintiff, no reasonable jury could conclude that the FBI fired Plaintiff for a reason other than his absence from work, and instead fired him with discriminatory intent based on his disability or retaliatory intent for his accommodation requests or pursuing redress through contact with the EEO office.  Therefore, Defendant's motion for summary judgment on Count III is granted.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss and for Summary Judgment (ECF No. 45) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 30, 2021

RUDOLPH CONTRERAS
United States District Judge

---

[17] This cited material is from the hostile-work-environment section of Plaintiff's brief, but Plaintiff describes the same event in his termination section.  *See* Opp'n at 43 (describing role-playing exercise at which Plaintiff was allegedly called "unworthy to volunteer").